**HOUSING WORKS, INC., Plaintiff,**

v.

**Jason TURNER, et al., Defendants.**

**No. 00 Civ. 1122(LAK).**

United States District Court,
S.D. New York.

March 30, 2005.

Matthew D. Brinckerhoff, Joanna C. Schwartz, Emery Celli Brinckerhoof & Abady, LLP, New York City, for Plaintiff.

John P. Woods, Michael S. Adler, Zoe Davidson, Michael A. Cardozo, Corporation Counsel of the City of New York, New York City, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Housing Works, Inc. ("Housing Works") here sues the City of New York and several city officials, including former Mayor Rudolph Giuliani, pursuant to 42 U.S.C. § 1983, alleging that defendants violated its rights under the Equal Protection Clause of the Fourteenth Amendment and caused them to lose several state and city contracts in retaliation for asserting their First Amendment rights. Defendants move for summary judgment dismissing Housing Works' claims under the Equal Protection Clause and the First Amendment.

Defendants move further to strike as hearsay certain of Housing Works' evidentiary submissions, including portions of an affidavit by Housing Works co-executive director Charles King, newspaper clippings, and copies of its newsletter. They argue also that Housing Works' counter-statement of facts pursuant to Local Civil Rule 56.1(b) ignores facts and inflates others, and that its response to defendants' statement of facts pursuant to Rule 56.1(c)

disputes defendants' factual assertions primarily by referring to sections of its counterstatement.[1] Finally, they assert that Housing Works may not rely on an opinion granting its motion for a preliminary injunction in a related case.[2]

## I. *Background*

This case arises from the contentious relationship between Housing Works, a not-for-profit advocacy organization and provider of housing and services for people with HIV and AIDS, and the administration of former Mayor Giuliani. Housing Works, a vocal and litigious critic of the former mayor and his AIDS policies, alleges that certain high-ranking officials in the Giuliani administration, in retaliation for its First Amendment activities, caused it to lose state and city contracts pursuant to which it provided housing and services to homeless individuals with HIV or AIDS. Defendants contend that their actions were not retaliatory, but taken in consequence of Housing Works' fiscal difficulties and accounting problems.

The facts are laid out fully in the Report and Recommendation of Magistrate Judge James C. Francis IV, dated September 15, 2004 (the "Report and Recommendation"), and a decision by Judge Victor Marrero on an earlier motion.[3] There is no need to repeat them here.

Magistrate Judge Francis recommended (1) denying the motion to strike, (2) granting the motion dismissing (a) the equal protection claims against Giuliani, Mastro, Barkan, Kaswan, Barrios–Paoli and Capoziello, (b) all claims against Cohen, (c) the First Amendment claim against Giuliani

with respect to the final non-responsibility appeal, (d) all claims against the City other than the First Amendment and equal protection claims with respect to the final non-responsibility appeal and the New York State Department of Labor ("NYSDOL") and New York State Department of Health ("NYSDOH") contracts, and (e) the claim for reputational damages, and (3) denying the motion in all other respects.

Both parties timely filed objections.[4] Defendants contend that the entire action should be dismissed as against all defendants. They argue that the Report and Recommendation erred in concluding that (1) the temporal proximity of the speech and the defendants' actions raises a genuine issue of fact as to retaliation, (2) Housing Works' speech was a matter of public concern, (3) whether the alleged retaliation began prior to the speech is an issue of fact, (4) Housing Works did not need to prove animus with respect to each defendant, and (5) there are questions of fact regarding whether defendants would have taken the same action regardless of Housing Works' speech under the *Mt. Healthy City Board of Education v. Doyle*[5] test. On the equal protection claims, defendants argue that the magistrate judge misconstrued the evidence in concluding that other contractors were similarly situated. They argue further that the Report and Recommendation erred in not recommending dismissal as to all defendants on the basis of qualified immunity and the dismissal of all claims against the City of New York.

---

1. Memorandum of Law in Support of Defendants' Motion to Strike at 1, 5–7.

2. *Housing Works, Inc. v. City of New York*, 72 F.Supp.2d 402 (S.D.N.Y.1999), *appeal dismissed*, 203 F.3d 176 (2d Cir.2000).

3. *Housing Works, Inc. v. Turner*, 179 F.Supp.2d 177 (S.D.N.Y.2001), *aff'd*, 56 Fed. Appx. 530, 2003 WL 56921 (2d Cir.2003).

4. *See* Fed R.Civ.P. 72(b).

5. 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Housing Works also objects to the Report and Recommendation. It argues that genuine issues of fact remain as to former Mayor Giuliani's alleged participation in delaying the non-responsibility appeal and its alleged reputational injury.

## II. *Defendants' Additional Evidence*

■ Defendants now submit seven supplemental declarations and an exhibit that were not before the magistrate judge, allegedly to clarify certain statements made in depositions and affidavits previously submitted. They argue that the additional evidence should be considered here because the Report and Recommendation "upheld Housing Works' claims on grounds different from those which had been addressed in the moving papers" and that some of the material issues of fact "are in fact not genuine as is shown below." [6]

The Court has discretion whether to consider evidence not submitted to the magistrate judge.[7] Nevertheless, litigants cannot be permitted to use litigation before a magistrate judge as something akin to a spring training exhibition game, holding back evidence for use once the regular season begins before the district judge.[8]

The motion for summary judgment was referred to a magistrate judge for a report and recommendation. Defendants submitted eighteen declarations and affidavits, fifteen reply declarations, and 185 exhibits in an attempt to show that there were no genuine issues of fact. The matter was litigated to the proverbial "fare thee well." Absent a most compelling reason, the submission of new evidence in conjunction with objections to the Report and Recommendation should not be permitted.

Defendants' excuse for not submitting the evidence to the magistrate judge is belied by the evidence they now submit. For example, the notice of claim they propose as Defense Exhibit 186 was attached to a letter of the same date to defendant and former Commissioner of the Human Resource Administration ("HRA") Lilliam Barrios–Paoli. The defendants submitted the letter as Exhibit 118. There is no reason why this notice of claim could not have been submitted to the magistrate

---

**6.** Woods Aff. 11/1/2004 ¶ 6.

**7.** *See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

**8.** In *Morris v. Amalgamated Lithographers of Am., Local One,* 994 F.Supp. 161 (S.D.N.Y. 1998), this Court wrote:

"Section 636(b)(1)(C) of the Judicial Code, 28 U.S.C. § 636(b)(1)(C), which provides for district court reviews of reports and recommendations by magistrate judges provides in Part that '[t]he judge *may* also receive further evidence ...' in the course of such a review. (Emphasis added) But the statute is permissive, not mandatory. While there may be cases in which the receipt of further evidence is appropriate, there are substantial reasons for declining to do so as a general matter. First, permitting such piecemeal presentation of evidence is exceptionally wasteful of the time of both the magistrate and district judges, the former having been compelled to write an arguably useless report based on less than the universe of relevant evidence and the latter being deprived of the benefit of the magistrate judge's considered view of the entire record. Second, opposing parties would be put to the burden of proceedings which, to a considerable degree, would be duplicative. Third, there would be instances in which parties would be encouraged to withhold evidence, particularly evidence which might be embarrassing as well as helpful on the merits, in the expectation of using it before the district judge only if they failed to prevail before the magistrate judge on a more abbreviated showing. Finally, the routine consideration of evidence in support of objections which could have been presented before the magistrate judge would reward careless preparation of the initial papers." *Id.* at 163.

judge, given that the letter to which it was attached was a hotly contested issue. In all the circumstances, defendants' reasons for not presenting this supplemental evidence to the magistrate judge are not persuasive and the Court therefore declines to consider it.

### III. *Objections*

While the Court agrees with most of Magistrate Judge Francis's recommendations, it writes separately to discuss the defendants' arguments in respect of whether the October 16, 1997 letter was a matter of public concern, whether Mr. Turner acted as an arm of the state in withdrawing Housing Works' certification for the NYSDOL/NYSDOH contract, qualified immunity with respect to Housing Works' First Amendment-protected activities, and its alleged mission nonfulfillment damages.

### A. *The October 16, 1997 Letter*

#### 1. *The Letter Involved a Matter of Public Concern*

Magistrate Judge Francis held without discussion that the October 16, 1997 letter to Commissioner Barrios–Paoli and the attached notice of claim were protected conduct. The Court agrees, but this conclusion warrants elaboration.

■ In *White Plains Towing Corp. v. Patterson*,[9] the Second Circuit held that a petition for redress of grievances "is 'generally subject to the same constitutional analysis' as the right to free speech."[10] Accordingly, a First Amendment claim can succeed only if, *inter alia*, the speech fairly can be considered as "related to any matter of political, social, or other concern to the community."[11] Whether an independent contractor's "speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."[12]

■ Housing Works' letter of October 16, 1997 to Commissioner Barrios–Paoli informed her that it had filed a notice of claim with the City "for damages resulting from HRA's continued refusal to reimburse Housing Works for expenses incurred in the operation of [its] Scattered Site Program."[13] Moreover, Housing Works advised her that "unless a contract is executed and we have received payment for all expenses and liabilities incurred to date by October 31, 1997 Housing Works will have no choice but to suspend operation of the program."[14] It added that if suspension were necessary, Housing Works would expect the City to work with the clients to avoid any disruption to their lives and avoid any return to homelessness. It concluded that it was one of the few programs able to house chemically-dependent individuals with HIV/AIDS and that HRA's actions would result in harm to this vulnerable population.

9. 991 F.2d 1049, 1059 (2d Cir.), *cert. denied.*, 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993).

10. *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)).

11. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see also City of San Diego v. Roe*, — U.S. —, — – —, 125 S.Ct. 521, 525–26, 160 L.Ed.2d 410 (2004) (explaining that "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public").

12. *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684.

13. Def. Ex. 118.

14. *Id.*

Defendants assert that the letter did not address a matter of public concern, but merely a private contractual dispute between Housing Works and HRA.[15] They contend that the "clear purpose ... was to resolve HW's ongoing contract dispute and advise HRA that HW would suspend the program absent a contract and full payment by a stated date." [16]

To be sure, the letter addresses primarily the contract that Housing Works hoped to negotiate with the City. However, "the mere fact that [Housing Works] took a personal interest in the subject matter of the speech does not remove the letter from the protection of the First Amendment." [17] The letter goes beyond the arguably private issue of payment to Housing Works under the contract to address the needs of the people with HIV/AIDS who were served by the scattered site program.[18]

Whether a contract dispute would lead to individuals with HIV/AIDS becoming homeless surely was a matter of social and community concern. Indeed, HRA addressed this point in its press release on the subject, stating that it was taking steps to ensure that no one would become home-less as a result of the dispute.[19] The media coverage of the dispute suggests also that the public found this issue newsworthy.[20] The October 16, 1997 letter and its statement regarding the future of the clients served by the program addressed a matter of public concern.

### 2. Mt. Healthy/ Greenwich *Analysis*

■ Defendants argue that they are entitled to dismissal even if they were motivated in part by a desire to retaliate against Housing Works for its constitutionally protected activities. They claim that they would have made the same decision notwithstanding the protected conduct.[21]

This analysis is governed by *Greenwich Citizens' Committee, Inc. v. Counties of Warren and Washington Industrial Development Agency,*[22] in which the Second Circuit held that when plaintiffs' protected conduct is a unitary event, a court must focus "precisely on whether the defendant acted for an impermissible reason, and not merely in response to plaintiff's conduct." [23] A unitary event is one in which the "plaintiff's protected conduct ... could prompt either a permissible or an imper-

---

**15.** Defendants' Reply Memorandum of Law ("Def.Reply") 14; Defendants' Memorandum of Law in Support of Rule 72(B) Objections to the Report and Recommendation of Magistrate Judge Francis ("Def.Obj.") 5.

**16.** Def. Obj. 5.

**17.** *Johnson v. Ganim,* 342 F.3d 105, 114 (2d Cir.2003) (internal citation omitted); *see also Lewis v. Cowen,* 165 F.3d 154, 164 (2d Cir. 1999) (First Amendment protection precluded when employee speaks *only* on matters of personal interest).

**18.** As noted in the Report and Recommendation, the contract dispute itself touched on a matter of public concern, as "the very purpose of those contracts was to provide housing for homeless people with HIV and AIDS." Report and Recommendation at 19.

**19.** Def. Ex. 121 ("HRA will ensure that clients being served by the Housing Works contract are housed and given services despite the expiration of the contract. No one will become homeless as a result of HRA's non-renewal of the [Housing Works] contract.").

**20.** *See, e.g.,* Pl.Ex. 2, Karen Matthews, *Arrests Follow Rally Demanding That City Fund Aids Housing,* THE RECORD (New Jersey) (noting reports that some scattered site clients had received eviction notices and reporting that HRA promised that no one served by the program would become homeless.).

**21.** Def. Obj. 8.

**22.** 77 F.3d 26 (2d Cir.1996).

**23.** *Id.* at 33.

missible reason on the part of the defendant to act, or possibly both reasons." [24]

Here, defendants' alleged motive of preventing the eviction of scattered site clients and Housing Works' letter advising of the possibility of such evictions constituted a unitary event. Accordingly, the question is whether defendants acted for a permissible reason in terminating the contracts. As explained in the Report and Recommendation, the plaintiff's circumstantial evidence of retaliatory animus raises an issue of fact as to whether defendants acted for a permissible reason and therefore is not amenable to resolution on summary judgment.

### B. Municipal Liability on the NYS-DOL/NYSDOH Contracts

Defendants object also to the Report and Recommendation's conclusion that material issues of fact remain as to possible liability on the part of the City. They maintain, *inter alia*, that Jason Turner withdrew certification for Housing Works as a vendor for the state's NYSDOL/NYS-DOH contracts "pursuant to New York State authority on a state contract involving state funds and was thus an 'arm of the state.' " [25] In consequence, they argue, the City cannot be held liable. Housing Works counters that Turner was acting "in his capacity as the 'Commissioner of the local social services district.' " [26]

At issue here was a requirement that Housing Works submit a letter of certification from the local social services district—in this case HRA, a city agency—in its proposal to create a welfare-to-work program for people with HIV/AIDS.[27] On December 15, 1998, Mr. Turner provided such certification.[28] On February 23, 1999, he withdrew that certification, citing Housing Work's problems maintaining adequate financial books and an Appellate Division ruling that it was unlikely to succeed in its retaliation claim against the City.[29]

▪ Whether a local social services commissioner [30] is acting as an arm of the state is a case-by-case determination based on state law, the source of funds for the program in question, state supervision of the local entity, and the responsibility or policymaking authority of the local entity.[31] In *Holley v. Lavine*,[32] the Second Circuit

---

**24.** *Id.* (citing *Bell v. School Bd.*, 734 F.2d 155 (4th Cir.1984)).

**25.** Def. Obj. 14 (emphasis omitted).

**26.** Plaintiff's Memorandum of Law in Opposition to Defendants' Objection to the Report and Recommendation of Magistrate Judge James C. Francis IV ("Pl.Opp.Mem.") 13 (quoting Report and Recommendation at 75).

**27.** Plaintiff's Memorandum of Law in Opposition to defendants' Motion for Summary Judgment ("Pl.Mem.") 43–44. Neither party refers to the state law or regulation creating the requirement, but it appears that the NYS-DOL/NYSDOH AIDS Institute HIV Welfare-To-Work Initiative Request for Proposal included this requirement. *See* Def. Ex. 137; Turner Aff. ¶ 6.

**28.** Def. Ex. 136.

**29.** Def. Ex. 137.

**30.** A "Commissioner of social services shall mean a city or county commissioner of social services." N.Y. Soc. Servs. Law § 2(10) (McKinney 2003).

**31.** This analysis is consistent with the Second Circuit's arm-of-the-state analysis in other arenas. For example, in determining whether the City University of New York is an arm of the state, the Second Circuit held that district courts should focus their analysis on the extent to which any judgment would be satisfied by the state and the degree of supervision over the defendant entity. *See Pikulin v. City Univ. of New York*, 176 F.3d 598, 600 (2d Cir.1999).

**32.** 605 F.2d 638 (2d Cir.1979).

held that a county social services commissioner was not an arm of the state in administering the Aid to Families with Dependent Children program because the county had final responsibility for making the public assistance payments and contributed twenty-five percent of the funds.[33]

The circuit addressed the same question with respect to the Home Energy Assistance Program ("HEAP") in *Marbley v. Bane*.[34] In the HEAP program, the state was responsible for all expenditures, and the county defendants had no policy authority. "[T]he only responsibility of the county defendants ... [was] to process paperwork and parcel out funds from the state treasury."[35] The court concluded that the county therefore acted as an arm of the state in administering HEAP.

■ Although none of the parties has outlined the legal framework for the certification process, it appears that Mr. Turner had significant autonomy in deciding whether to certify an organization's proposal. Here, he first granted a certificate for the proposal and then, according to Ms. Papandrea, withdrew it after she called to inform him that Housing Work's proposal ranked highest on the NYSDOL's list.[36] The role of the commissioner in this program therefore is different from that in *Marbley*. Mr. Turner was not simply processing paperwork for the state, but making an individual determination with regard to each organization and proposal.

The next factor is the project's source of funds. According to Mr. Turner, the City

was responsible for twenty-five percent of the funding for the HIV/AIDS welfare-to-work program.[37] The remaining funding likely came from the state.[38]

In all the circumstances, given the autonomy of the social services commissioner in deciding whether to certify the proposals and the fact that twenty-five percent of the funding came from the City, it cannot be said that Mr. Turner was acting as an arm of the state for purposes of the HIV/AIDS welfare-to-work program.

### C. *Qualified Immunity*

The Report and Recommendation recommended against dismissal on the basis of qualified immunity, explaining that it cannot be determined that defendants' decisions were objectively reasonable because issues of fact remain as to their intent. Defendants object to this conclusion, arguing that their actions were objectively reasonable given Housing Works' severe financial reporting problems.[39] This argument is addressed fully in the Report and Recommendation. The Court agrees with the magistrate judge's reasoning.

■ Defendants Mastro, Kaswan, Barkan and Barrios–Paoli next argue that they are entitled to dismissal on the basis of qualified immunity because "reasonable administrators could have disagreed as to whether [Housing Works'] flier and what was known of the demonstration implicated matters of public concern."[40] Barrios–Paoli argues further that the law was not

**33.** *Id.* at 644–45.

**34.** 57 F.3d 224 (2d Cir.1995).

**35.** *Id.* at 233.

**36.** Pl.Ex. 58, Papandrea Dep. 60–61.

**37.** Turner Aff. ¶ 8.

**38.** *See* Pl.Ex. 58, Papandrea Dep. 24–25 (stating that she believed it to be a state funded proposal but could not remember whether city funds were to be used as well).

**39.** Def. Obj. 11–12.

**40.** *Id.* at 12.

well-settled that the October 16, 1997 letter was a matter of public concern.[41]

As discussed above, the October 16, 1997 letter touched on the fate of the clients in the scattered site program that was the subject of the contract dispute. Moreover, as detailed in the Report and Recommendation, the Housing Works flier and demonstration spoke to the need for appropriate housing for persons with HIV/AIDS and the fate of clients then-served by Housing Works in the scattered site program.[42] These issues squarely implicate matters of social and community concern. The contention that plaintiffs' speech was not clearly a matter of public concern under then-existing law is without merit.[43]

### D. *Damages*

Housing Works here seeks compensatory and punitive damages for its alleged losses as a result of defendants' alleged violations of their constitutional rights. The magistrate judge recommended granting defendants' motion with respect to Housing Works' alleged reputational damages and denying the motion with respect to all other alleged damages, including its alleged out-of-pocket expenses and mission nonfulfillment damages.

Defendants contest Housing Works' alleged mission nonfulfillment damages on several grounds. First, they assert that the mission nonfulfillment damages Housing Works seeks are unavailable as a matter of law, as they are psychic damages that corporate entities may not recover.[44] Next, they contend that if plaintiffs were to recover for the loss of the contracts, recovery should be governed by principles of contract law, which limit damages to the equivalent of lost profits.[45] Third, they argue that the Court should decline to find such damages as a matter of policy.[46] Finally, they contend that Housing Works' expert testimony is inadmissible under Rule 702 of the Federal Rules of Evidence because the method for calculating mission nonfulfillment damages is unreliable.[47]

■ "[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principals derived from the common law of torts."[48] Dam-

---

**41.** She contends further that her decision was objectively reasonable given Housing Works' failure to pay the rent on some of the scattered site apartments. But as there is circumstantial evidence of Ms. Barrios–Paoli's animus, *see* Report and Recommendation at 28–29, the objective reasonableness of her actions remains to be seen. *See Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir.2003).

**42.** Report and Recommendation at 19.

**43.** In *Hale v. Mann*, 219 F.3d 61 (2d Cir. 2000), the Second Circuit concluded that a letter addressing the administration of state facilities for juvenile offenders was a matter of public concern. *Id.* at 71. Citing its opinions dating from 1993, it noted that it had long held that any issue of political, social or community interest was a matter of public concern. *Id.*

**44.** Def. Mem. 52.

**45.** *Id.* at 54.

**46.** *Id.* at 55–58

**47.** *Id.* at 59–60. Fed.R.Evid. 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

**48.** *Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 305–06, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986).

ages for violations of constitutional rights therefore are awarded to compensate for the injury caused by the defendant's conduct.[49] They are not available, however, "based on the abstract 'value' or 'importance' of constitutional rights."[50] Where the plaintiff has not suffered an actual injury as a result of defendant's violation of the constitutional right, only nominal damages may be awarded.[51] With these principles in mind, the Court turns to Housing Works' claim for damages for the alleged injury to its mission.

### 1. Are Mission Nonfulfillment Damages Compensable as a Matter of Law?

Housing Works contends that defendants' alleged retaliation:

"hampered the effectiveness of Housing Works' constitutionally protected activities because it prevented Housing Works from (1) recruiting new members (as every person served by Housing Works becomes a member); (2) disseminating its views to the people it would have served under the contracts; (3) encouraging the people it would have served under the contracts to participate in Housing Works' advocacy activities; and (4) advocating on behalf of the people Housing Works would have served under the contracts."[52]

In consequence, it maintains, it is entitled to damages for this alleged inability to fulfill its mission.[53]

Defendants argue that the magistrate judge erred in concluding that mission nonfulfillment damages are compensable as a matter of law. The question for the Court, therefore, is whether Housing Works conceivably could prove some set of facts that would permit recovery for an alleged injury to its mission.

Courts have recognized that an organization may suffer compensable injury as a result of an inability to fulfill its mission in consequence of a constitutional tort. In *Irish Lesbian and Gay Organization ("ILGO") v. Giuliani*,[54] the Second Circuit addressed damages sought by an organization that alleged that the City unconstitutionally denied it a permit for a protest march along Fifth Avenue before the annual St. Patrick's Day Parade, from which it had been excluded.[55] In reversing the district court's determination that ILGO did not have standing, the court held that "[a]n organization, as well as an individual, may suffer from the lost opportunity to express its message."[56] It explained further, however, that "any recovery must be based on actual loss."[57] In the absence of any actual loss, the court noted, ILGO could recover only nominal damages.

49. *Id*. at 307 (quoting 2 F. HARPER, F. JAMES & O. GRAY, LAW OF TORTS § 25.1, at 490 (2d ed.1986)); *Carey v. Piphus*, 435 U.S. 247, 255, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir.1999) ("Civil actions brought under § 1983 are analogous to state common law tort actions serving primarily the tort objective of compensation.").

50. *Stachura*, 477 U.S. at 309, 106 S.Ct. 2537.

51. *Carey*, 435 U.S. at 266, 98 S.Ct. 1042; *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 651 (2d Cir.1998).

52. Pl. Mem.51.

53. *Id*. at 49–50.

54. 143 F.3d 638 (2d Cir.1998).

55. *Id*. at 643.

56. *Id*. at 650.

57. *Id*. at 650 n. 5.

The Seventh Circuit concluded similarly that an organization may recover for injuries to its mission in *Watseka v. Illinois Public Action Council ("IPAC").*[58] The district court there awarded the plaintiff damages in the amount of $8,300 as a result of defendant's violation of its First Amendment rights, of which $5,000 was for the loss of its First Amendment rights.[59] IPAC had alleged as injuries "(1) its inability to recruit new members in Watseka, (2) its inability to disseminate its views to Watseka residents, and (3) its inability to encourage Watseka citizens to support IPAC position on various issues by signing petitions or contracting local legislators."[60] On appeal, the defendant argued that the plaintiff could obtain only nominal damages for the loss of the First Amendment rights. The Seventh Circuit upheld the award, concluding that the district court had based the $5,000 figure on the "specific compensable, non-abstract harm to IPAC [that] can be seen from the specific injuries alleged by IPAC which we noted above." [61]

More recently, the Ninth Circuit upheld also a damage award for frustration of mission under the Fair Housing Act. In *Fair Housing of Marin v. Combs,*[62] the plaintiff brought an action for illegal housing discrimination on the basis of race,

alleging that it had to divert its resources to counteract the defendant's discriminatory practices and suffered frustration of its mission.[63] The district court entered judgment for mission frustration damages in the amount of $10,160, "namely for design, printing, and dissemination of literature aimed at redressing the impact [defendant's] discrimination had on the Marin housing market." [64] With little discussion, the Ninth Circuit upheld the award after concluding that it was well-supported by the record.

 Although none of these cases involved public contracts, they make clear that injury to an organization's ability to fulfill its mission as a result of a constitutional tort may be compensable under Section 1983 provided that the plaintiff can establish an actual loss.[65] As the Court cannot say that plaintiff could prove no facts under this compliant that would entitle it to such damages, defendants' contention that this damage claim should be rejected as a matter of law is without merit.[66]

### 2. *The Proposed Testimony*

Housing Works here alleges that defendants' unconstitutional conduct caused them to lose public contracts worth more

---

**58.** 796 F.2d 1547 (7th Cir.1986), *aff'd,* 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (mem.), *reh'g denied,* 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 703 (1987).

**59.** *Id.* at 1548.

**60.** *Id.*

**61.** *Id.*

**62.** 285 F.3d 899 (9th Cir.2002).

**63.** *Id.* at 905.

**64.** *Id.*

**65.** The fact that public contracts are at issue does not change the analysis. *See Ivani Contracting Corp. v. City of New York* 103 F.3d 257, 261–62 (2d Cir.1997).

**66.** It is worth noting here that defendants did not move for summary judgment dismissing the nonfulfillment damages claim under *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), viz. that Housing Works lacks admissible evidence of any actual injury to its mission. *See* Adler Letter, Mar. 17, 2005 at 1. Accordingly, the Court is not called upon to determine whether Housing Works has evidence sufficient to get to a jury on this issue.

than $32 million.[67] It concedes, however, that its costs in providing services under the contracts would have exceeded the revenue they would have produced.[68] Housing Works bid for the contracts at a loss and therefore suffered no lost profits from defendants' alleged actions.[69] Put another way, Housing Works is better off financially than it would have been absent the alleged constitutional violations.

Housing Works nevertheless proposes to call Rikki Abzug, Ph.D., to testify that in her opinion "Housing Works has suffered losses equivalent to the sum of the face value of all of its lost or suspended government contracts ... [and] these losses greatly inhibited Housing Works ability to fulfill its mission to its full and unbridled capacity."[70] Dr. Abzug would testify that this figure is in excess of $32 million, exclusive of interest, a number that is derived from the face value of five contracts that were subject to renewal or extension and eleven finite-term contracts.[71]

Dr. Abzug contends that the quantitative measure of the alleged frustration to Housing Works' mission is the amount of the contracts because the City was "contracting with Housing Works to provide services toward mission fulfillment."[72] The report explains that it uses the gross revenue from the contracts as the measure of damages because "[e]very dollar that Housing Works did not receive from cancelled, terminated or denied contracts must be replaced exactly to ensure the organization's long term capacity to fulfill its mission as required by its charter."[73]

67. Pl. Mem. 50.

68. *Id.* at 61; Def. Ex. 60, Abzug Dep. 396.

69. An alternate calculation used by the defendants is that the lost profits on the contracts would equal the eight percent amount Housing Works would have received on each project for overhead, less any savings from not having to perform under the contract. *See* Def. Ex. 61, Garstka Rep. at 5.

> Housing Works has claimed also damages for out-of-pocket costs as a result of defendants' alleged actions and seeks also to obtain recovery in that amount.

70. Def. Ex. 58, Seltzer Rep. 5; Def. Ex. 60, Abzug Dep. 8–9, 388.

71. Housing Works seeks also damages in the amount of $9.5 million for alleged out-of-pocket expenses associated with three of the contracts that were not renewed. These expenses are alleged to have been incurred as follows:

(1) $1.2 million for scattered site services that it provided from July 1, 1997 to October 31, 1997 when the City was still referring clients to the program, King Decl. ¶ 221;
(2) $180,000 it paid to settle litigation against it after the scattered site contract's termination forced it to break a commercial lease it contends it entered into at HRA's behest, *id.* ¶ 222;
(3) $7,577,780 for its operation of the 9th Street and East New York supportive housing residences without the $70 per person per day subsidy it had negotiated with the City prior to the alleged retaliation, *id.* ¶ 223–24; and
(4) approximately $600,000 for training job seekers with HIV/AIDS for which it alleges it would have reimbursed by the state absent the alleged retaliation. *Id.* ¶ 225.
Housing Works concedes that had it obtained the contracts at issue, these expenses would have been covered. *Id.* ¶ 230; Pl. Mem. 50 n. 47. That is, its alleged damages for mission nonfulfillment subsumes its alleged out-of-pocket expenses. Accordingly, Housing Works may not recover *both* the full amount of its alleged out-of-pocket costs and its alleged mission nonfulfillment damages. *See Conway v. Icahn & Co., Inc.,* 16 F.3d 504, 511 (2d Cir.1994) ("Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed.").

72. Def. Ex. 60, Abzug Dep. 402.

73. Def. Ex. 58, Seltzer Rep. 21. The report arrives at this determination on the basis of:

"(1) copies of Housing Works reports to its Board of Directors for Housing Works'

The report asserts that this dollar-for-dollar measure can be verified against the "dramatic loss of revenue experienced by Housing Works" after the 1997 press release asserting that it was terminating its contracts and would not enter into any new ones.[74] It further contends that:

> "it is clear that but for the City's actions against Housing Works in 1997 and beyond, the organization would have continued to grow at a rate substantially higher per year than shown here, putting the organization's estimated projected 2002 revenues far beyond its current operating budget of $27 million."[75]

Dr. Abzug bases this conclusion on a chart that shows Housing Works' past yearly operating and contract revenue and the percentage of yearly growth.[76]

Defendants contend that this testimony is unreliable because it cannot be tested and has not been subject to peer review and publication. They assert further that this method of calculating damages fails because it does not take into account other factors, including costs that were associated with the contracts, "alternate uses made of otherwise-necessary resources,

and the true value of any mission portion impaired."[77]

### 3. *Admissibility under Rule 702*

■ Expert testimony is admissible where it "will assist the trier of fact to understand the evidence or to determine a fact in issue" and is sufficiently reliable. In its determination of reliability under Rule 702, *Daubert v. Merrell Dow Pharmaceuticals*,[78] and its progeny, a district court should consider (1) whether the testimony is grounded in sufficient facts, (2) whether the underlying methodology is reliable, and (3) whether the witness has applied the method reliably to the facts.[79] The proponent of the testimony has the burden to show that it is relevant and reliable and must do so by a preponderance of the evidence.[80]

### a. *Helpfulness of the Proposed Testimony*

■ Here, Dr. Abzug proposes to testify principally that the sum of the face value of the lost contracts is the proper measure of damages. But the proper measure of damages is a question of law

**74.** *Id.* at 21.

**75.** *Id.*

**76.** *Id.* at 22.

**77.** Def. Mem. 62.

**78.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**79.** *Zaremba v. General Motors Corp.*, 360 F.3d 355, 358 (2d Cir.2004).

**80.** *See Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F.Supp.2d 423, 486 (S.D.N.Y. 2002); *Cayuga Indian Nation of New York v. Pataki*, 83 F.Supp.2d 318, 322 (N.D.N.Y. 2000).

monthly board meetings; (2) interviews with Charles King, Co–President of Housing Works; (3) a copy of [HRA's] October 22, 1997 Press Release; (4) a compendium of various press reports concerning Housing Works and its disputes with the City that appeared in the press form late 1997 onward; (5) a list of the various contracts lost by Housing Works as a result of the City's 1997 decision, which included the annual value of the each contract; (6) Charts showing Housing Works' revenue growth and government contract value as percentage of overall operating budget from 1991 to 2002, and Housing Works development history, (7) Housing Works' corporate documents, including its mission statement and by-laws; and (8) various academic works by experts on non-profit and corporate management and fundraising." *Id.* at 4.

for the Court.[81] Her opinion therefore is little more than a legal conclusion and well beyond the bounds of permissible expert testimony.[82]

█ Moreover, assuming *arguendo* that the testimony is something more than a legal conclusion, Dr. Abzug is not the proper vehicle for introducing evidence of the alleged injury. Her relevant expertise is in general nonprofit management,[83] not Housing Works' mission and the extent to which defendants' alleged conduct inhibited that mission. In other words, the subject of the testimony largely is lay matter that may be put into evidence, assuming it is otherwise relevant and admissible, by witnesses familiar with Housing Works and its expression of its mission.

b. *Reliability of the Proposed Testimony*

█ Even if expert testimony on this subject would be helpful to a jury, Dr. Abzug's damage theory lacks any indication of reliability. As noted, if Housing Works had obtained the contracts, it would have been economically worse off than without them. Accordingly, it has suffered no economic loss. The loss or injury here is to the value of Housing Works' expression of its mission, but Dr. Abzug provides no logical connection between the face value of the contracts and any quantification of that loss of expression.

For example, she provides no evidence of the number of new members that Housing Works would have recruited under the contracts and whether their loss led to a concomitant decline in membership. The calculation similarly does not address the amount, if any, by which Housing Works' advocacy activities were curtailed as a result of the lost contracts and whether it was able to continue to advocate by any other means. Although the report suggests that Housing Works had to replace the amount of revenue under the contracts to continue expressing the organization's mission, it does not quantify the level of resources, if any, Housing Works diverted to that effort.

In short, Dr. Abzug has done little more than attach a number to the value to Housing Works of expressing its mission. That Housing Works' personnel subjectively may value its expression in the amount of the contract revenue at issue does not alter the fact that the calculation is "based on the abstract 'value' or 'importance' of [its] constitutional rights." [84] And this will not do.

Accordingly, defendants' objections to the Report and Recommendation on this ground are sustained and Dr. Abzug's proposed testimony on mission nonfulfillment damages is excluded.

## IV. *Conclusion*

Defendants remaining objections are overruled. Plaintiff's objections are with-

**81.** *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir.1998).

**82.** *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994); *United States v. Scop*, 846 F.2d 135, 139–40 (2d Cir.), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (2d Cir.1988); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509–10 (2d Cir.1977).

**83.** Dr. Abzug is an Assistant Professor of Nonprofit Management at the Robert J. Milano School of Management and Urban Policy of the New School University. Def. Ex. 58, Seltzer Dep. 4. The primary focus of Dr. Abzug's work has been on institutional theory, sector theory, governance and boards of directors. Def. Mem. 61. In addition, she has served on the board of the Association for Research in Nonprofit Organizations and Voluntary Action and worked as a management consultant. Def. Ex. 60, Abzug Dep. 63.

**84.** *Stachura*, 477 U.S. at 309, 106 S.Ct. 2537.

out merit and are overruled. The Report and Recommendation is adopted, except to the extent that it found admissible plaintiff's expert testimony on mission nonfulfillment damages. Defendants' motion for summary judgment dismissing the complaint [docket item 87] is granted to the extent set forth above and in the Report and Recommendation and otherwise denied. Their motion to strike [docket item 101] is denied. The declarations and exhibit submitted by defendants in support of their objections to the Report and Recommendation are stricken. Plaintiffs may not offer the testimony of Dr. Abzug at trial.

SO ORDERED.