# IN THE SUPREME COURT OF CALIFORNIA

CALIFORNIA MEDICAL ASSOCIATION,
Plaintiff and Appellant,

v.

AETNA HEALTH OF CALIFORNIA INC.,
Defendant and Respondent.

S269212

Second Appellate District, Division Eight
B304217

Los Angeles County Superior Court
BC487412

July 17, 2023

Justice Evans authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Jenkins concurred.

CALIFORNIA MEDICAL ASSOCIATION v. AETNA HEALTH OF CALIFORNIA INC.

S269212

Opinion of the Court by Evans, J.

The California Medical Association, a professional association representing California physicians, has sued a health insurance company, alleging the company violated the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.) by engaging in unlawful business practices. The UCL confers standing on a private plaintiff to seek relief under the statute only if that plaintiff has "suffered injury in fact" and "lost money or property as a result of the unfair competition" at issue. (Bus. & Prof. Code, § 17204.)[1] This case presents the question whether an organization can satisfy these two related standing requirements by diverting its own resources to combat allegedly unfair competition.

The issue arises here because, under the UCL as it was amended in 2004 by Proposition 64, a membership organization such as the California Medical Association may not base standing to sue on injuries to its members, but only on those to the organization itself. (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1003–1004 (*Amalgamated Transit*).) And, while an organization would clearly have standing under the UCL if it were, for example, fraudulently induced to buy a product from a deceptive

_____

[1] Unless otherwise specified, statutory references are to the Business and Professions Code.

1

seller (see § 17201 [broadly defining "person[s]" who can sue under the UCL]), this case presents us with a more difficult question: whether resources that an organization has spent to counter an unfair or unlawful practice constitute "money or property" that has been "lost . . . as a result of the unfair competition." (§ 17204.)

We hold that the UCL's standing requirements are satisfied when an organization, in furtherance of a bona fide, preexisting mission, incurs costs to respond to perceived unfair competition that threatens that mission, so long as those expenditures are independent of costs incurred in UCL litigation or preparations for such litigation. When an organization has incurred such expenditures, it has "suffered injury in fact" and "lost money or property as a result of the unfair competition." (§ 17204.) In this case, which arises on appeal from summary judgment for the defense, the record discloses a triable issue of fact as to whether the plaintiff association expended resources in response to the perceived threat the health insurer's allegedly unlawful practices posed to plaintiff's mission of supporting its member physicians and advancing public health. The evidence was also sufficient to create a triable issue of fact as to whether those expenses were incurred independent of this litigation. For these reasons, the trial court erred in granting summary judgment for the defense. We therefore reverse the judgment of the Court of Appeal, which affirmed the grant of summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Aetna Health of California Inc. (Aetna) provides health insurance. For its preferred provider plans, Aetna contracts with a network of physicians and other medical

providers who offer care to insured individuals at an agreed rate. Member patients can also see providers outside the network on referral from in-network physicians, but may bear a greater share of the cost. Effective in 2009, Aetna adopted a "Network Intervention Policy" designed, according to its terms, to "reduce the number of non par [i.e., nonparticipating, or out-of-network] referrals by par providers and if necessary take further action against participating providers who refuse, after warning and education to comply with the terms of their contract." (See *California Medical Assn. v. Aetna Health of California Inc.* (2021) 63 Cal.App.5th 660, 662–664 (*California Medical*).)[2]

The California Medical Association (CMA) is a nonprofit professional organization, founded in 1856, that advocates on behalf of California physicians. By CMA's count, it has more than 37,000 physician members. CMA's established mission, which it carries out through " 'legislative, legal, regulatory, economic, and social advocacy' " (*California Medical, supra*, 63 Cal.App.5th at p. 664), includes "the protection of the public health and the betterment of the medical profession." According to its vice-president and general counsel, CMA "has been especially active in advocacy and education on issues involving health insurance companies' interference with the sound medical judgment of physicians providing care to enrollees."

---

[2] We have drawn some factual background (unchallenged by either party through a petition for rehearing) from the opinion of the Court of Appeal below. (See Cal. Rules of Court, rule 8.500(c)(2).)

In 2010, at least two years before it filed suit, CMA learned of Aetna's Network Intervention Policy from its members and became concerned that in threatening termination or actually terminating participating physicians for their referrals to out-of-network providers, the policy's implementation interfered with physicians' exercise of their sound medical judgment. Aetna maintains that its policy, rather than interfering in medical judgments, was designed simply to encourage participating physicians, consistent with their judgment, to use in-network care providers, such as ambulatory surgery centers, and was adopted in part in response to physicians referring patients to facilities in which they had financial interests. The merits of the parties' dispute are not before us, and we express no views on them.

CMA's general counsel estimated that the organization diverted 200–250 hours of staff time to respond to the policy. That time was spent on activities including: (i) "investigat[ion]" for the purpose of "advis[ing] physicians and the public regarding how to address Aetna's . . . interference with the physician-patient relationship in an effort to avoid litigation over this issue"; (ii) "prepar[ing] a 3-page document entitled the 'Aetna Termination Resource Guide,' which [CMA] publicized, advising . . . members about Aetna's new policy . . . , including ways to proactively address and counteract Aetna's policies"; (iii) engaging with physicians affected by Aetna's policy and interacting with Aetna on physicians' behalf; and (iv) "prepar[ing] a letter to California's Department of Insurance and California's Department of Managed Health Care requesting that they take action to address" Aetna's change in policy. According to the general counsel, at least some of this

diverted time "would otherwise have been devoted to serving [CMA's] membership" in other respects.

In July 2012, CMA sued Aetna, alleging Aetna's implementation of the Network Intervention Policy violated the UCL both because it was unfairly oppressive and injurious and because it violated specified sections of the Insurance Code, Business and Professions Code, and Health and Safety Code. CMA sought to enjoin Aetna from enforcing the policy. Aetna moved for summary judgment. It argued that CMA lacked UCL standing because CMA had not lost money or property as a result of the policy. Aetna emphasized that the policy applied to individual physicians — not to CMA. CMA countered that it had diverted resources in response to the policy.

The trial court granted Aetna's motion for summary judgment on standing grounds. Relying on *Amalgamated Transit*, *supra*, 46 Cal.4th 993, the court concluded that an organization's diversion of resources is not "sufficient to establish standing under the UCL." CMA appealed.

The Court of Appeal affirmed. (*California Medical*, *supra*, 63 Cal.App.5th 660.) First, the court held that CMA could seek an injunction against Aetna only if CMA had individually suffered injury in fact and lost money or property; injury to CMA's members did not suffice. That conclusion is not disputed here. Second, the court addressed whether CMA's evidence that it diverted substantial resources to investigate and oppose Aetna's actions showed that CMA itself suffered injury in fact and lost money or property. (*Id.* at p. 667.) The court held that the evidence did not create a material dispute of fact on this point, because CMA had merely expended resources for its members' benefit: CMA "was founded to advocate on behalf of

its physician members. The staff time spent here in response to Aetna's termination and threats to terminate physicians was typical of the support CMA provides its members in furtherance of CMA's mission." (*Id.* at p. 668.) If CMA's expenditure of resources in this manner sufficed to establish standing, the appellate court reasoned, "then any organization acting consistently with its mission to help its members through legislative, legal and regulatory advocacy could claim standing based on its efforts to address its members' injuries. The 2004 amendments to the UCL eliminated such representational standing." (*California Medical,* at p. 668.)

We granted CMA's petition for review.

## II. DISCUSSION

Sections 17200 to 17210 of the Business and Professions Code contain what we now refer to as the unfair competition law. (*Stop Youth Addiction, Inc., v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558, fn. 2 (*Stop Youth Addiction*); see *id.* at pp. 569–570 [history of UCL].) The law's "purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' " (*McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 954 (*McGill*).) To that end, the UCL takes aim at "unfair competition," a term it defines to "include any unlawful, unfair or fraudulent business act or practice." (§ 17200.) The phrase "any unlawful . . . business act or practice" (*ibid.*) in effect " ' "borrows" ' rules set out in other laws and makes violations of those rules independently actionable." (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370.) The text of section 17200 also "makes clear that a practice may be deemed unfair even if not specifically proscribed by some

other law." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)

The UCL's broad reach contrasts with the somewhat limited scope of the remedies that the statutory scheme creates. The UCL affords private plaintiffs the ability to seek injunctive relief and restitution in response to unfair conduct. (§ 17203; see also *Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 790 (*Clayworth*).) But the UCL does not itself authorize an award of damages or attorney's fees. (*Zhang v. Superior Court*, *supra*, 57 Cal.4th at p. 371.) It approves awards of civil penalties only in actions brought by specified governmental plaintiffs. (§ 17206; *State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1307.) These limited remedies are not exclusive, however; they "are cumulative to each other and to the remedies or penalties available under all other laws of this state." (§ 17205.)

This case concerns the circumstances in which a private organization may seek injunctive relief under the UCL. In the past, "any person acting for the interests of itself, its members or the general public" could bring a UCL action — even if that person had not been injured by the business act or practice at issue. (Former § 17204; see *Stop Youth Addiction*, *supra*, 17 Cal.4th at pp. 561, 567.) Some in the legal and business communities were concerned that this broad authority to sue allowed attorneys "to file frivolous lawsuits against small businesses even though they ha[d] no client or evidence that anyone was damaged or misled." (Voter Information Guide, Gen. Elec. (Nov. 2, 2004) argument in favor of Prop. 64, p. 40; see *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 316–317 (*Tobacco II Cases*); *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 178, fn. 10.) In response, the electorate approved

Proposition 64, a 2004 initiative measure. (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228–229 (*Mervyn's*); see Voter Information Guide, Gen. Elec., *supra*, text of Prop. 64, § 1, p. 109 [findings and declarations of purpose].)

Proposition 64 limited the set of eligible private UCL plaintiffs to those persons who have "suffered injury in fact" and "lost money or property as a result of" the business act or practice at issue. (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 64, § 3, p. 109; § 17204.) The "injury in fact" requirement is borrowed from federal constitutional law and overlaps to a considerable degree with the "lost money or property" inquiry. (§ 17204; see *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322–323 & fn. 5 (*Kwikset*).) The core inquiry is whether the plaintiff has suffered "*economic injury . . . caused by . . .* the unfair *. . .* practice *. . .* that is the gravamen of the claim." (*Id.* at p. 322.)

Whether CMA has standing to bring a claim under the UCL requires us to answer two questions of statutory interpretation.[3] The first is whether diversion of staff time can qualify as an "injury in fact" and loss of "money or property" within the meaning of section 17204. The second is whether an organization that chose to divert staff time to counteract the defendant's business practice can be said to have lost that staff time "as a result of" (*ibid.*) that practice. We review these

---

[3] That CMA is not a natural person does not matter for standing purposes. Section 17201 defines "person," as used in the UCL's enforcement provisions, to include "associations and other organizations of persons."

interpretive questions de novo, beginning by examining the statutory language to determine the voters' intent. We construe that language in its full statutory context, keeping in mind the nature and purposes of the statutory scheme as a whole. (*People v. Lewis* (2021) 11 Cal.5th 952, 961; *Kwikset*, *supra*, 51 Cal.4th at p. 321.) To the extent there are ambiguities in the initiative's language affecting its application to the case, we turn to "extrinsic sources such as ballot summaries and arguments for insight into the voters' intent." (*Kwikset*, at p. 321.)

Whether the trial court erred by granting Aetna's motion for summary judgment is likewise subject to de novo review, and like the trial court ruling on the motion, we must view the evidence in the light most favorable to CMA and draw all reasonable inferences in CMA's favor. (*Weiss v. People ex rel. Department of Transportation* (2020) 9 Cal.5th 840, 864; *Samara v. Matar* (2018) 5 Cal.5th 322, 338.)

## A. Economic Injury

A private plaintiff has UCL standing only if that plaintiff "has suffered injury in fact and has lost money or property." (§ 17204.) Because loss of money or property is a subset of injury in fact, proof of harm to money or property will generally satisfy the injury-in-fact requirement. (See *Kwikset*, *supra*, 51 Cal.4th at pp. 323, 325.)

The phrase "injury in fact" is borrowed from, and was intended to incorporate aspects of, the federal constitutional law of standing. (See Voter Information Guide, Gen. Elec., *supra*, text of Prop. 64, § 1, subd. (e), p. 109 [declaring intent to limit standing to plaintiffs who have been "injured in fact under the standing requirements of the United States Constitution"].) To establish a case or controversy within the scope of the federal

judicial power (U.S. Const., art. III, § 2), a plaintiff in federal court "must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." (*Federal Election Commission v. Cruz* (2022) __ U.S. __ [142 S.Ct. 1638, 1646].) Proposition 64 incorporated the injury-in-fact requirement into the UCL (*Kwikset*, *supra*, 51 Cal.4th at pp. 322–323) but did not borrow the traceability or redressability requirements of the federal standing inquiry.[4] To show an injury in fact, a plaintiff must identify " 'an invasion of a legally protected interest which is (a) concrete and particularized, [citations]; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " ' " (*Kwikset*, at p. 322.)

The UCL's focus on "los[s]" of "money or property" (§ 17204) restricts the broad range of harms that could otherwise give rise to standing. As a matter of federal law, an injury can be concrete — i.e., " 'real,' and not 'abstract' " — even if the injury is personal instead of economic; even certain intangible injuries qualify as injury in fact. (*Spokeo, Inc. v. Robins* (2016) 578 U.S. 330, 340; accord, *TransUnion LLC v. Ramirez* (2021) __ U.S. __ [141 S.Ct. 2190, 2204]; *Kwikset*, *supra*, 51 Cal.4th at p. 324, fn. 6.) Under the UCL, however, only injuries to money or property — that is, only economic injuries — can support standing. (*Kwikset*, at p. 324.)

---

[4]    In place of the federal traceability requirement, Proposition 64 included its own causation element for standing: that the injury was incurred "as a result of" the challenged business practice. (§ 17204.) We discuss that element in the next section.

Beyond this limitation to economic injuries, section 17204's reference to "money or property" does not otherwise define or limit the injury-in-fact inquiry. (*Kwikset*, *supra*, 51 Cal.4th at pp. 323–325.) A showing of economic injury requires only that the plaintiff allege or prove "a personal, individualized loss of money or property in any nontrivial amount." (*Id.* at p. 325.) Moreover, because the issue is one of standing, rather than the amount of restitution due, "a specific measure of the amount of this loss is not required. It suffices that a plaintiff can allege an ' "identifiable trifle" ' [citation] of economic injury." (*Id.* at p. 330, fn. 15.)

As we explained in *Kwikset*, "[t]here are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary. [Citation.] Neither the text of Proposition 64 nor the ballot arguments in support of it purport to define or limit the concept of 'lost money or property,' nor can or need we supply an exhaustive list of the ways in which unfair competition may cause economic harm." (*Kwikset*, *supra*, 51 Cal.4th at p. 323.)

CMA contends it suffered an economic injury through the diversion of personnel and other resources to respond to Aetna's Network Intervention Policy, resources that would otherwise have been deployed to assist CMA's members in other ways. Consistent with our observation in *Kwikset* that Proposition 64 did not "purport to define or limit" what constitutes lost money

or property (*Kwikset, supra*, 51 Cal.4th at p. 323), we conclude that diversion of salaried staff time and other office resources can constitute the loss of "money or property" within the meaning of section 17204. Every organization, including CMA, has finite resources to devote to its mission. If the organization uses staff time for a particular project, for example, it must either pull those hours from a different project or augment its staff. Even if, as here, the personnel involved are paid on a salaried basis rather than by the hour, their time clearly holds economic value to the organization. When staff are diverted to a new project undertaken in response to an unfair business practice, the organization loses the value of their time, which otherwise would have been used to benefit the organization in other ways. (Cf. *Convoy Co. v. Sperry Rand Corp.* (9th Cir. 1982) 672 F.2d 781, 785–786 [plaintiff in breach of contract case can recover cost of salaried staff time spent supervising defective computer system]; *VMark Software, Inc. v. EMC Corp.* (1994) 37 Mass.App.Ct. 610, 620 [642 N.E.2d. 587, 594] [damages in misrepresentation case "should have included the costs of the hours fruitlessly spent by EMC employees trying to make the defective computer system work"].)

While the exact question of UCL standing presented here is one of first impression in this court, it has been addressed by other courts applying California law, and closely analogous questions of federal standing have been addressed by the federal courts. Before turning to those decisions, though, we observe that CMA's theory of economic injury is consistent with how we have understood this element of UCL standing. In *Kwikset*, we held that consumers who purchased locksets in reliance on an allegedly false " 'Made in U.S.A.' " label (*Kwikset, supra*, 51

Cal.4th at p. 316) "ha[d] 'lost money or property' within the
meaning of Proposition 64" (*id.* at p. 317), even though the
products were not objectively defective and the plaintiffs, "while
they had spent money, [had] 'received locksets in return' " (*id.*
at p. 331). Consumers deceived in this manner, we explained,
suffered economic injuries when they purchased products they
would not have bought, at least at that price, had the products
been accurately labeled. (*Id.* at pp. 329–330.) *Kwikset* relied in
part on our earlier decision in *Clayworth*, *supra*, 49 Cal.4th at
pages 788–789, where we held that the plaintiff pharmacies'
ability to pass drug manufacturers' allegedly illegal overcharges
on to consumers did not defeat their standing under the UCL,
because they suffered an economic injury when they paid the
manufacturers' inflated prices. (*Kwikset*, at p. 334.)

Our cases thus teach that economic injury for purposes of
UCL standing, even after Proposition 64, is not limited to
out-of-pocket expenditures for which no value has been received,
or to objectively determined overpayments. In that respect, the
facts here can be seen as loosely analogous to those in *Kwikset*
and *Clayworth*. CMA may not have incurred additional
out-of-pocket costs in responding to Aetna's allegedly illegal
practices; its employees were salaried and would have been paid
regardless. But the economic value CMA received from their
labor was reduced. CMA "lost money or property" (§ 17204)
when its personnel were diverted from other activities that
would also have served its goal of assisting its physician
members. In *Kwikset*'s terms, CMA "enter[ed] into a
transaction, costing money or property, that would otherwise
have been unnecessary," as its staff was diverted from what the
organization regarded as useful projects to respond to Aetna's

13

allegedly unfair business practices. (*Kwikset, supra*, 51 Cal.4th at p. 323.) That injury suffices for standing purposes.

On facts closer to those shown here, courts have agreed that UCL standing can be based on an organization's diversion of resources in response to a threat to its mission. In *Animal Legal Defense Fund v. LT Napa Partners LLC* (2015) 234 Cal.App.4th 1270 (*Animal Legal Defense*), the plaintiff organization had advocated for a California ban on the sale of foie gras and was active in informing the public about the law once enacted. (*Id.* at p. 1280.) On discovering that the defendant's restaurant was continuing to serve foie gras, the organization diverted staff time and resources from other projects to complete an investigation of the restaurant, share its findings with local law enforcement authorities, and try to persuade those authorities to enforce the ban against the defendant. (*Ibid.*) The Court of Appeal concluded the plaintiff's diversion of resources constituted economic injury as *Kwikset* had explained that UCL standing requirement: in response to the defendant's allegedly illegal sales, the organization had " 'enter[ed] into a transaction, costing money or property, that would otherwise have been unnecessary.' " (*Animal Legal Defense*, at p. 1280, quoting *Kwikset, supra*, 51 Cal.4th at p. 323.)[5]

_____

[5] Among the organization's steps in *Animal Legal Defense* was hiring a private investigator to dine at the restaurant and request foie gras. (*Animal Legal Defense, supra*, 234 Cal.App.4th at p. 1275.) The Court of Appeal's decision, however, does not emphasize that outside expenditure as establishing loss of money or property; it places at least equal

Similarly, in *Southern California Housing Rights Center
v. Los Feliz Towers Homeowners Ass'n* (C.D.Cal. 2005) 426
F.Supp.2d 1061 (*Southern California Housing*), a condominium
owner and a housing rights organization sued a homeowners'
association for failing to provide the owner with an accessible
parking space as a reasonable accommodation for her disability.
(*Id.* at p. 1063.)   In a brief analysis, the federal district court
concluded the organization had standing under the UCL, even
after Proposition 64, because it had presented "evidence of
actual injury based on loss of financial resources in investigating
this claim and diversion of staff time from other cases to
investigate the allegations here."   (*Id.* at p. 1069; accord, *In re
WellPoint, Inc. Out-of-Network UCR Rates Litigation* (C.D.Cal.
2012) 903 F.Supp.2d 880, 900 [relying on *Southern California
Housing* in declining to dismiss plaintiff associations' claims of
organizational injury].)

A   California   appellate   court   later   cited   *Southern
California   Housing*   as   one   of   several   examples   of   how
"expend[ing]   money   due   to   the   defendant's   acts   of   unfair
competition"   could   establish   economic   injury,   describing   the
federal case with the parenthetical explanation, "housing rights
center   lost   financial   resources   and   diverted   staff   time
investigating   case   against   defendants."      (*Hall   v.   Time
Inc.* (2008) 158 Cal.App.4th 847, 854.)   This court, in turn, later
cited that passage from *Hall* as "cataloguing some of the various
forms of economic injury." (*Kwikset*, *supra*, 51 Cal.4th at p. 323.)

stress   on   the   evidence   the   organization's   own   staff   "spent
months on the effort to persuade Napa authorities to take action
based on the alleged violations."   (*Id.* at p. 1282.)

While *Kwikset* did not specifically endorse the decision in *Southern California Housing*, our approving citation of *Hall*'s catalogue, which included the citation to *Southern California Housing* and described its diversion-of-resources reasoning, indicates at the least that the diversion theory of standing is not facially inconsistent with *Kwikset*'s understanding of the UCL after Proposition 64.

The Court of Appeal below considered *Animal Legal Defense* distinguishable on the ground that the plaintiff organization in that case, unlike CMA here, "was not advocating on behalf of or providing services to help its members deal with their loss of money or property." (*California Medical*, *supra*, 63 Cal.App.5th at p. 668.) Because CMA's expenditures benefited its physician members who were threatened by Aetna's policy, the lower court reasoned, CMA's suit is in reality a representative one. (*Ibid.*) Aetna makes the same argument.

We find the lower court's reasoning unpersuasive for at least two reasons. First and most fundamentally, the court's opinion appears to conflate CMA's own claimed injury, its expenditure of resources responding to Aetna's policy, with the injuries to the member physicians affected by that policy. The two injuries are conceptually distinct, even if CMA acted in part to prevent further injury to its members. Relatedly, the Court of Appeal appears to have confused associational standing, under which an association "may bring an action on behalf of its members when the association itself would not otherwise have standing" (*Amalgamated Transit*, *supra*, 46 Cal.4th at p. 1004), with organizational standing, in which the organization asserts its own claims based on its own injuries.

For the same reason, we are not persuaded that, as Aetna maintains, CMA's standing theory is foreclosed by our decision in *Amalgamated Transit*.  The plaintiff unions in that case, unlike CMA, made no claim to injuries distinct from those to their members, instead seeking standing only as assignees and representatives of the injured union members.  (*Amalgamated Transit*, *supra*, 46 Cal.4th at pp. 998–999.)  Here, in contrast, CMA's standing theory — organizational rather than associational standing — is based on its own claim of economic injury.

Second, the perceived threat to CMA's mission went beyond injury to physician members of CMA.  By imposing unwarranted restrictions on network physicians' medical referrals, in CMA's view, Aetna's policy impaired CMA's efforts to protect the public health.  Whether or not the plaintiff organization in *Animal Legal Defense* had members who were affected by the alleged unlawful practices, the organization could claim injury in its diversion of limited resources to respond to a threat to its own mission, a claim that may equally be made by a membership organization like CMA.

The Court of Appeal's discussion of this point is also unclear as to its bearing on the standing question.  Proposition 64's amendments to the UCL did not eliminate representative actions.  In section 17204, the measure requires that all private plaintiffs have suffered an economic injury; in section 17203, it mandates that private plaintiffs bringing representative actions comply with class actions procedures and requirements developed under Code of Civil Procedure section 382.  (See *Arias v. Superior Court* (2009) 46 Cal.4th 969, 977–980.)  Even if CMA's suit were considered a representative one, then, the

organization could still claim standing based on its own economic injury.[6]

Both *Animal Legal Defense* and *Southern California Housing* relied on a line of federal decisions, beginning with *Havens Realty Corp. v. Coleman* (1982) 455 U.S. 363 (*Havens*),

---

[6]     As we explained in *McGill, supra*, 2 Cal.5th at pages 959–960, a party with individual standing to sue under section 17204 may do so even if the complaint seeks injunctive relief that primarily benefits the public, and such a request for relief does not make the action a representative one under section 17203 or require compliance with Code of Civil Procedure section 382.

In its brief, CMA maintains that it seeks injunctive relief that would primarily benefit the public rather than CMA's membership and that the action therefore should not be deemed representative for purposes of section 17203.  Aetna, on the other hand, argues that the action is subject to section 17203, and CMA should have to comply with Code of Civil Procedure section 382, because the organization's request for injunctive relief primarily seeks to further the interests of its physician members.

We need not resolve this dispute, nor need we address the underlying premise that section 17203 might apply to some claims of injunctive relief and not others.  (Cf. *McGill*, at pp. 960–961 [distinguishing a claim for public injunctive relief from a claim seeking " '*disgorgement and/or restitution* on behalf of persons other than or in addition to the plaintiff' "].)  The question of section 17203's application, and whether compliance with Code of Civil Procedure section 382 is required here, is separate from the question of standing under section 17204 — the sole ground on which summary judgment against CMA was rendered and affirmed.  The Court of Appeal did not address section 17203's requirement of compliance with Code of Civil Procedure section 382, but focused throughout on standing under section 17204.  We therefore need not decide in this case whether CMA's action is subject to section 17203, and we express no opinion on that point.

holding that an organization may establish injury in fact by showing that it diverted resources in response to a threat to its mission. (See *Animal Legal Defense*, *supra*, 234 Cal.App.4th at pp. 1281–1282; *Southern California Housing*, *supra*, 426 F.Supp.2d at p. 1069.) CMA, as well, relies on *Havens* and its progeny for its standing theory here, while Aetna maintains that the narrower standing limits of the UCL after Proposition 64 make the federal cases inapposite. On reviewing the federal decisions, we find them to be persuasive authority for CMA's theory of UCL standing.

In *Havens*, a nonprofit corporation devoted to increasing equal housing opportunities in the Richmond, Virginia area joined individuals who had allegedly suffered from a building owner's racial steering practices in suing the owner under the federal Fair Housing Act of 1968 (*Havens*, *supra*, 455 U.S. at pp. 366–368), alleging the defendant's practices had frustrated the organization's mission and caused it " 'to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices.' " (*Id.* at p. 379.) The high court held the organization's allegations satisfied the federal Constitution's injury-in-fact requirement, reasoning that "[i]f, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources — constitutes far more than simply a setback to the organization's abstract social interests . . . ." (*Ibid.*) In a footnote, the court added: "That the alleged injury

19

results from the organization's noneconomic interest in encouraging open housing does not affect the nature of the injury suffered [citation], and accordingly does not deprive the organization of standing." (*Id.* at p. 379, fn. 20.)

Federal courts have applied the reasoning of *Havens* in numerous cases, finding that organizations with a variety of missions have suffered injury in fact through the diversion of their resources. (See, e.g., *Nnebe v. Daus* (2d Cir. 2011) 644 F.3d 147, 156–157 [taxi drivers' alliance may base standing to sue regulatory agency on expenditure of resources in counseling and assisting drivers threatened with summary suspension]; *Heights Community Congress v. Hilltop Realty, Inc.* (6th Cir. 1985) 774 F.2d 135, 139 & fn. 2 [fair housing organization had standing to sue over racial steering]; *Crawford v. Marion County Election Bd.* (7th Cir. 2007) 472 F.3d 949, 951 [Democratic Party has standing to challenge voter identification law because the law causes the party "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"]; *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC* (9th Cir. 2012) 666 F.3d 1216, 1219 [fair housing organizations had standing to sue over allegedly illegal roommate referral practices because the defendant's conduct "caused [them] to divert resources independent of litigation costs and frustrated their central mission"]; *El Rescate Legal Services, Inc. v. Executive Office of Immigration Review* (9th Cir. 1991) 959 F.2d 742, 748 [organizations assisting immigrant refugees established standing by alleging that federal agency's translation policy "frustrates [their] goals and requires the organizations to expend resources in representing clients they otherwise would

spend in other ways"]; *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* (11th Cir. 2021) 11 F.4th 1266, 1287 [organization serving food to homeless had standing to sue city over city's restrictions on food-sharing activities because, among other effects, "volunteers who would have normally worked on preparing for food-sharing demonstrations had to divert their energies to advocacy activities such as attending City meetings and organizing protests against the Ordinance"]; *Spann v. Colonial Village, Inc.* (D.C. Cir. 1990) 899 F.2d 24, 27 [fair housing organizations had standing to sue over racially biased advertising because the allegedly illegal practices caused them to "devote resources to checking or neutralizing the ads' adverse impact"]; see also *Pacific Legal Foundation v. Goyan* (4th Cir. 1981) 664 F.2d 1221 [adopting diversion-of-resources theory prior to *Havens*].)

The *Havens* court did not characterize the alleged injury it found sufficient for organizational standing as economic or noneconomic; unlike UCL standing, federal constitutional standing does not turn on that distinction. Indeed, the high court's opinion left it somewhat uncertain whether the injury that mattered was the "impair[ment to] HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers," the "consequent drain on the organization's resources," or both. (*Havens, supra,* 455 U.S. at p. 379.) The footnoted statement that the alleged injury "results from the organization's noneconomic interest in encouraging open housing" (*id.* at p. 379, fn. 20) does not imply that the injury itself is noneconomic: both the "impair[ment]" of the organization's activities (*id.* at p. 379), seemingly a noneconomic harm, and the "consequent drain on the organization's

21

resources" (*ibid.*), seemingly an economic one, could be said to result from the organization's interest in promoting equal housing opportunities.

Some of *Havens*'s progeny, however, have more clearly identified the injury that establishes standing under the diversion-of-resources theory as an economic one. In *Fair Housing of Marin v. Combs* (9th Cir. 2002) 285 F.3d 899, 905, for example, the court held a fair housing organization suing a property owner for racial discrimination "has direct standing to sue because it showed a drain on its resources from both a diversion of its resources and frustration of its mission." The appellate court noted that the district court had, in fact, awarded more than $16,000 in diversion-of-resources damages to compensate the organization for its " 'economic losses' " in staff pay and other " 'funds expended.' " (*Ibid.*; see also *Heights Community Congress v. Hilltop Realty, Inc.*, *supra*, 774 F.2d at p. 139, fn. 2 [characterizing housing organization's expenditures for monitoring real estate practices as an "economic injury"].) In *Nnebe v. Daus*, *supra*, 644 F.3d at page 157, the court recognized that the taxi drivers' alliance had incurred an "opportunity cost" when its resources were diverted to counseling drivers on the city's suspension policy and held that this showing of "economic effect" sufficed to establish injury in fact. And in *Crawford v. Marion County Election Bd.*, *supra*, 472 F.3d at page 951, it was the "added cost" that the Democratic Party incurred getting voters to the polls that established the party's standing. As these courts have understood it, at least, the crucial injury in a diversion-of-resources case is clearly an economic one.

Like the courts in *Animal Legal Defense* and *Southern California Housing*, therefore, we find the *Havens* line of federal

decisions persuasive authority for a rule that an organization's diversion of resources can establish "injury in fact" and "lost money or property" for purposes of section 17204. As explained earlier, the voters in Proposition 64 intended to adopt the injury-in-fact requirement from federal standing law. The added reference to "lost money or property" does no more than limit the cognizable injuries to economic ones. (*Kwikset, supra,* 51 Cal.4th at p. 325.) As *Havens* and its progeny make clear, an organization that has expended staff time or other resources on responding to a new threat to its mission, diverting those resources from other projects, has suffered an economic injury in fact.[7]

Relying on the rule that a party opposing summary judgment cannot create an issue of fact by a declaration that contradicts the party's prior discovery responses (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500, fn. 12), Aetna argues that the declaration by CMA's general counsel estimating that the organization diverted 200–250 hours of staff time to respond to

---

[7] Aetna cites *In re Sony Gaming Networks and Customer Data Sec. Breach Litigation* (S.D.Cal. 2012) 903 F.Supp.2d 942, 966, along with two unreported district court rulings, for the proposition that loss of time is not an economic loss for purposes of UCL standing. But the plaintiff in each of these cases was an individual or a class of individuals who spent their personal, uncompensated time responding to the alleged unfair competition, not an organization alleging diversion of paid staff time. (See *id.* at p. 950; *Knippling v. Saxon Mortg., Inc.* (E.D.Cal., Mar. 22, 2012, No. 2:11-CV-03116-JAM) 2012 WL 1142355, p. *1; *Ruiz v. Gap, Inc.* (N.D.Cal., Feb. 3, 2009, No. 07-5739 SC) 2009 WL 250481, p. *1.) Our discussion and holding here are limited to organizational standing; we say nothing about individual standing.

Aetna's policy must be disregarded because it contradicts prior discovery responses, and that without that declaration there is no evidence to show economic injury even under the diversion-of-resources theory. The cited depositions, however, show only that one CMA employee (testifying on this point only in his individual capacity) was unaware of databases tracking expenses "for responding to specific member inquiries" and that, according to another employee (whom CMA had designated as most qualified to answer), CMA "is working on trying to identify the cost for resources expended to address the Aetna illegal terminations. . . . [B]ut we don't have that available today." (Aetna also cites *its own response* to one of CMA's filings in opposition to summary judgment, but that contains no admissions by CMA.) The cited deposition testimony does not contradict the general counsel's later declaration estimating the extent of CMA's diverted staff time, and accordingly, there is no barrier to our consideration of it.

### B. Causation

A private plaintiff has UCL standing only if the plaintiff lost money or property "as a result of" the practice at issue. (§ 17204.) In *Kwikset*, we concluded this language imposed a causation requirement on UCL standing: " 'The phrase "as a result of" in its plain and ordinary sense means "caused by" and requires a showing of a causal connection or reliance on the alleged misrepresentation.' " (*Kwikset*, *supra*, 51 Cal.4th at p. 326.) In a fraud case like *Kwikset*, reliance is key because " 'reliance is the causal mechanism of fraud.' " (*Ibid.*, quoting *Tobacco II Cases*, *supra*, 46 Cal.4th at p. 326.) As in *Tobacco II Cases*, also a fraud case, *Kwikset* limited its discussion of the causation element to such cases, declining to opine on the

contours of causation where the alleged unfair competition did not lie in misrepresentation. (*Kwikset*, *supra*, 51 Cal.4th at p. 326, fn. 9; *Tobacco II Cases*, *supra*, 46 Cal.4th at p. 325, fn. 17.) In the present case, of course, Aetna's Network Intervention Policy is attacked not as fraudulent but as violative of laws protecting medical decisionmaking. Beyond establishing that "as a result of" in section 17204 requires a causal connection between the alleged unfair competition and the plaintiff's economic injury, therefore, our precedents are of limited use in deciding how the statutory requirement is to be applied here.

Aetna argues that section 17204 imposes a requirement of *proximate* causation akin to that in tort law, and that this requirement cannot be met here because CMA independently chose to oppose Aetna's policy. According to Aetna, "[a] plaintiff who chooses to advocate against a practice with which it happens to disagree, assuming it lost money at all when advocating, did so because of that choice, not because of the defendants' alleged conduct. [CMA's] 'choice,' in other words, is an intervening cause that breaks any chain of causation." CMA, on the other hand, contends that section 17204 requires only "but for" causation. And even if proximate causation were required, CMA further maintains, to break the chain of proximate causation an intervening cause must be of independent origin, and here the opposite is true. CMA asserts that its "dedication of resources to respond to actions that frustrate its mission is not 'of independent origin' — the origin of the diversion *is* the allegedly unlawful conduct." Because CMA's diversion of resources was a foreseeable response to Aetna's implementation of its policy, CMA argues, it did not break the chain of proximate causation.

There are reasons to doubt that section 17204 imports a proximate cause requirement from the substantive law of negligence into the test for UCL standing. Neither the text of section 17204 nor our decisions in *Kwikset* and *Tobacco II Cases*, which address reliance as the causative mechanism in misrepresentation cases, contain language suggesting a proximate causation test applies. The "unlawful, unfair or fraudulent business act[s] or practice[s]" (§ 17200) at which the UCL takes aim are not markedly similar to the conduct that can give rise to a negligence action.

Ultimately, however, we need not resolve the question here. In any event, we agree with CMA's alternative argument: CMA's decision to devote resources to responding to Aetna's Network Intervention Policy was not a supervening or superseding cause under the law of proximate causation if it were to apply.

In a decision both parties cite, this court explained that a supervening or superseding cause, one that breaks the chain of proximate causation, is a "later cause of independent origin" that was neither "foreseeable by the defendant" nor "caused injury of a type which was foreseeable." (*Akins v. County of Sonoma* (1967) 67 Cal.2d 185, 199; accord, *Ballard v. Uribe* (1986) 41 Cal.3d 564, 587; *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56.) " '[F]or an intervening act properly to be considered a superseding cause, the act must have produced "harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." ' " (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1017.)

The facts here do not involve any such independent and unforeseeable conduct by CMA or any third party. Aetna implemented its Network Intervention Policy by communications with physicians in its preferred provider networks, in some cases threatening to terminate their network participation. That some of those physicians would alert CMA, the state's most prominent physician association, was highly foreseeable. That CMA would come to their assistance by working to reverse or alter Aetna's policy, attempting to prevent its implementation in ways that impinged on its members' medical practices, was equally foreseeable. CMA's response to Aetna's policy, while voluntary, thus derived foreseeably from Aetna's conduct. It was not the type of independent, unforeseeable action that would preclude a finding of proximate cause in a tort context. Even if section 17204 incorporated a proximate cause requirement into its UCL standing test, that requirement would be met.

Aetna compares this case to *Two Jinn, Inc. v. Government Payment Service, Inc.* (2015) 233 Cal.App.4th 1321, 1326 (*Two Jinn*), in which a licensed bail agency sued an unlicensed company for providing bail services in violation of the UCL. As part of its argument for standing, the plaintiff averred it had "suffered an economic injury by incurring 'significant costs and expenses' to investigate the 'nature, scope and extent of Defendant's conduct.'" (*Id.* at p. 1334.)[8] The Court of Appeal

---

[8] The plaintiff also claimed injury from direct competition, but the appellate court rejected that theory because the evidence showed that "any diversion of potential customers from Aladdin to GPS results from the Legislature's establishment of the cash

rejected that theory of standing on causation grounds: "These 'pre-litigation' costs do not establish standing to bring a UCL claim because they are not an economic injury caused by the business practices that Aladdin characterizes as unlawful. Rather, . . . the reason Aladdin incurred prelitigation expenses was to generate evidence. Aladdin then used that evidence to support this lawsuit." (*Ibid.*) Distinguishing *Havens* on its facts, the court explained that "[h]ere, proof that Aladdin spent money to investigate GPS's activities would not show that those allegedly unfair business activities had any independent economic impact on Aladdin's bail bond business. Beyond that, *Havens* does not hold or intimate that a party can manufacture an economic injury by incurring investigation costs to generate evidence for its lawsuit." (*Id.* at p. 1335.)

Similarly in this case, Aetna argues, its Network Intervention Policy did not affect CMA's operations, since the policy applied only to physicians. CMA should not be able to rely on its expenditures opposing that policy for UCL standing, any more than the bail agency in *Two Jinn*, which was not directly injured by the defendant's allegedly illegal conduct, could rely on its investigative costs to establish an economic injury for standing.

CMA does not take issue with the propositions, reflected in *Two Jinn*'s reasoning, that the diversion-of-resources theory requires a threat to the plaintiff organization's mission and that

---

bail payment system as an alternative to the traditional bail bond service, and not from the fact that GPS conducts its business without a bail agent license." (*Two Jinn, supra,* 233 Cal.App.4th at p. 1332.)

expenditures made for UCL litigation itself cannot support UCL standing. But, CMA argues, both requirements were met here. Aetna's policy, at least in the view of CMA, threatened physicians' medical independence and consequently the public health, both objects of CMA's protective mission. In response, CMA undertook efforts to assist its members in dealing with Aetna's policy, to persuade Aetna to stop enforcing the policy, and to spur regulatory action against the policy. These efforts were independent of this litigation, which was commenced approximately two years after CMA began responding to Aetna's policy.

We agree with this analysis. As the *Animal Legal Defense* court explained, in assessing causation under the diversion-of-resources theory, "the proper focus is on whether the plaintiff 'undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged [misconduct] rather than in anticipation of litigation.' " (*Animal Legal Defense*, *supra*, 234 Cal.App.4th at pp. 1283–1284.) Thus the plaintiff must show that the defendant's actions have posed a threat to the plaintiff organization's mission, causing it to devote resources to allay the threat. (*East Bay Sanctuary Covenant v. Biden* (9th Cir. 2021) 993 F.3d 640, 663; *Rodriguez v. City of San Jose* (2019) 930 F.3d 1123, 1134 ["The organization cannot, however, 'manufacture the injury by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all' "].)[9]

---

[9]     Although the Proposition 64 voters did not borrow the traceability requirement from federal standing law along with

Moreover, expenditures an organization makes in the course of UCL litigation, or to prepare for such litigation, do not serve, for purposes of UCL standing, to establish an injury in fact resulting from the allegedly unfair competition. (*Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 815.) That parallels the rule adopted in several federal decisions applying *Havens*: "An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule

---

that of injury in fact, the closeness of the factual contexts makes cases applying *Havens* somewhat helpful in understanding how causation works for organizational standing under section 17204. To satisfy the traceability requirement, "there must be a causal connection between the injury and the conduct complained of — the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" (*Lujan v. Defenders of Wildlife* (1992) 504 U.S. 555, 560.) Where the organization's mission has been impaired or threatened, courts have deemed the diversion of resources traceable to the defendant's conduct. (See, e.g., *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach* (9th Cir. 2011) 657 F.3d 936, 943 [organization assisting day laborers established sufficient "causal connection" between city's antisoliciting ordinance and organization's diversion of resources]; *Pacific Legal Foundation v. Goyan*, *supra*, 664 F.2d at p. 1224 [pre-*Havens* decision: in light of the plaintiff's mission, it was "only natural for plaintiff to increase its vigilance and efforts" in response to contested policy].) In some circumstances, however, a causal chain posited for organizational standing can become so attenuated that it fails the fair-traceability test. (See, e.g., *Center for Law and Educ. v. Department of Educ.* (D.C. Cir. 2005) 396 F.3d 1152, 1160–1161.)

otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation." (*Spann v. Colonial Village, Inc.*, *supra*, 899 F.2d at p. 27; accord, *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest* (9th Cir. 2010) 624 F.3d 1083, 1088; *Fair Housing of Marin v. Combs*, *supra*, 285 F.3d at p. 90.)

As CMA argues, however, it has met both standing requirements. The evidence submitted on summary judgment sufficiently showed (that is, it was sufficient to create a triable issue) that CMA's expenditures in diverted resources were undertaken in response to a perceived threat to CMA's ability to perform its preexisting mission, which according to its general counsel includes "advocacy and education on issues involving health insurance companies' interference with the sound medical judgment of physicians." CMA alleges that Aetna's policy posed a perceived threat to this mission, in particular to the independent medical decisionmaking by its physician members and thus to the health of patients; CMA responded by diverting its own resources to oppose the policy. The evidence further showed that some or all of those resource diversions were independent of any preparations CMA may have made for this litigation. The expenditures included efforts to counsel CMA's members on how to deal with Aetna's implementation of the Network Intervention Policy, provision of public information for the use of patients, and interactions with regulatory agencies with the goal of stopping Aetna's policy implementation, or alleviating its effects, by means other than private litigation under the UCL.

This is not a case of an organization attempting to manufacture standing and insert itself into a dispute in which

it had no natural stake.  While voluntary in one sense — CMA,
like many other organizations, is free to set its own budgetary
priorities — its decision to expend resources on working to
counter the perceived threat in Aetna's policy followed from that
policy in a sufficiently direct and uninterrupted causal chain.[10]

For the above reasons, Aetna was not entitled to
summary judgment on causation grounds.

### C.  Evasion of Proposition 64's Purposes

Beyond their textual arguments focused on economic
injury and causation, Aetna and its allied amici curiae contend
that recognizing a diversion-of-resources theory of standing in
this case would flout the intent of the voters who passed
Proposition 64 in order to restrict UCL standing.  To assess
these claims, we look beyond the operational text in section
17204 — which is consistent with the diversion-of-resources
theory but does not explicitly endorse it — and examine other
indicia of voter intent.

---

**10**      As Aetna notes, one federal appellate court held the
*Havens* standing theory inapplicable where the only threat
posed by a challenged statute was to the plaintiff organization's
"pure issue-advocacy." (*Center for Law and Educ. v. Department
of Educ., supra,* 396 F.3d at p. 1162.)  In a later decision,
however, the same court expressed doubt about the existence of
"a sharp distinction between advocacy and other activities"
(*American Soc. for Prevention of Cruelty to Animals v. Feld
Entertainment, Inc.* (D.C. Cir. 2011) 659 F.3d 13, 26) and
concluded that "[u]ltimately, whether injury to an organization's
advocacy supports *Havens* standing remains an open question"
(*id.* at p. 27).  In any event, CMA claims not that Aetna's policy
impaired its ability to lobby government agencies on abstract
issues, but that it threatened CMA's mission of service to its
members, the medical profession, and the public health.

In its introductory findings and declarations, Proposition 64 identified certain assertedly objectionable practices in UCL litigation, including the law's "misuse[] by some private attorneys who . . . [¶] . . . [¶] (3) [f]ile lawsuits for clients *who have not* used the defendant's product or service, viewed the defendant's advertising, or *had any other business dealing with the defendant*." (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 64, § 1, subd. (b)(3), p. 109, italics added.) We alluded in *Kwikset* to this italicized language, describing Proposition 64's "apparent purposes" as eliminating standing "*for those who have not engaged in any business dealings with would-be defendants* and thereby strip such unaffected parties of the ability to file 'shakedown lawsuits,' while preserving for actual victims of deception and other acts of unfair competition the ability to sue and enjoin such practices." (*Kwikset*, *supra*, 51 Cal.4th at p. 317, italics added; see also *id*. at p. 321.) Observing that CMA neither competes with Aetna nor was itself subject to the Network Intervention Policy, Aetna argues CMA had no business dealings with it and, therefore, necessarily lacks standing to sue under our decision in *Kwikset*.

Aetna's argument reads too much into *Kwikset*'s allusion to Proposition 64's purposes. In *Kwikset*, there was no dispute that the plaintiffs had dealt with the defendant, whose allegedly false labeling had led the plaintiffs to purchase the defendant's product. (*Kwikset*, *supra*, 51 Cal.4th at p. 319.) Nowhere in *Kwikset* did we suggest that section 1 of Proposition 64, which set out the initiative measure's findings and statement of purpose, holds legal force independent of the actual statutory language added by the measure. With regard to standing, that operational language is contained in section 17204, which does

not require a plaintiff to have had business dealings with the defendant but only to have "suffered injury in fact" and "lost money or property as a result of the unfair competition." *Kwikset*'s holdings were reached through analysis of that operative language, not by reliance on the statement of purpose in section 1 of Proposition 64. (See *Kwikset*, *supra*, 51 Cal.4th at pp. 321–327.)

Section 1 of Proposition 64 explained to voters why limits on standing to sue were viewed as necessary but did not itself add any such limits to the law. The section's reference to plaintiffs who have had no business dealings with the defendant formed part of that explanation; it did not add or amend any statutory provisions of the UCL. (See *Allergan, Inc. v. Athena Cosmetics, Inc.* (Fed.Cir. 2011) 640 F.3d 1377, 1383 ["Proposition 64 did not add a 'business dealings requirement' to standing under section 17204"].) Understood as explanatory rather than operational, the reference to lack of business dealings does not indicate an intent to bar suit by plaintiffs like CMA who have suffered economic injury as a result of an allegedly unlawful or unfair business practice.

Though it was neither a competitor of Aetna nor a consumer of that company's services, CMA was affected in its mission by Aetna's policy. CMA responded by devoting staff time and other resources to opposing and helping its members navigate that policy's implementation, a diversion of resources that constituted an economic injury. CMA is far from the type of disinterested plaintiff Proposition 64 sought to bar from suing under the UCL, and in seeking an injunction against practices that caused it to divert its own resources CMA has not brought

what the voters characterized as a " 'shakedown lawsuit[].' "
(*Kwikset*, *supra*, 51 Cal.4th at p. 317.)

More broadly, Aetna argues that the diversion-of-resources theory subverts the limiting intent of Proposition 64 by allowing an organization to "create standing for [itself] by choosing to advocate against any practice the organization disagrees with." Aetna raises the hypothetical case of an organization with a generally stated mission, for example "Californians for Fair Competition," that after "a brief stint of advocacy" could have standing for "wide swaths of potential UCL litigation," thus reinstituting the kind of " 'shakedown suits' " by uninjured plaintiffs Proposition 64 was intended to foreclose. Amicus curiae the United States Chamber of Commerce makes a similar argument, hypothesizing that "an attorney who wishes to sue travel agencies who fail to include their agents' licenses on their websites," for example, could form an organization with a stated mission of promoting transparency in the travel industry, hire a staff member and, "after a few weeks, . . . 'divert' that staff member's time to writing letters to travel agencies who have not publicly posted their agents' licenses."

We are not persuaded that recognizing a diversion-of-resources theory in this case will open the door to abuses of the sort suggested by Aetna and the amicus curiae. CMA is an organization with a bona fide mission of promoting the medical profession and the public health, not one formed for the purpose of UCL litigation. Its pursuit of these goals substantially predates the events that gave rise to this litigation, rather than being adopted as a pretext to create UCL standing. Aetna's Network Intervention Policy, in CMA's view, threatened CMA's

ability to pursue its mission, and it responded by taking several steps to oppose the policy and alleviate its effects on CMA's members, independent of any existing or planned UCL litigation. These steps required reallocation of staff time and other resources from other ongoing projects, giving rise to the economic injury that supports standing here. CMA presented sufficient evidence to, at the least, create triable issues of fact on these points.

In contrast, the organizations in Aetna's and the amicus curiae's hypotheticals might well have difficulty establishing that they were sincerely pursuing missions separate from planned UCL litigation and that their efforts on a given issue were not undertaken simply to establish standing for such litigation. Without an articulable mission focused enough to make sense outside the UCL litigation context, an organization like "Californians for Fair Competition" would be hard pressed to show that its allocation of resources was in fact undertaken in response to a threat to its mission or that it diverted staff from mission-oriented work they would otherwise have pursued. In short, it is far from clear that an isolated "brief stint of advocacy," unconnected to a preexisting mission independent of UCL litigation, would suffice to show economic injury and causation for purposes of section 17204.

## III. CONCLUSION

Viewing the evidence submitted on Aetna's motion for summary judgment in the light most favorable to CMA and drawing all reasonable inferences in CMA's favor, as we must (*Weiss v. People ex rel. Department of Transportation*, *supra*, 9 Cal.5th at p. 864), we conclude the evidence established a triable issue of fact as to standing to sue under the UCL. The Court of

Appeal erred in affirming the trial court's grant of summary judgment for the defense on the ground that CMA lacked such standing.

## IV. DISPOSITION

The judgment of the Court of Appeal is reversed.

**EVANS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  California Medical Association v. Aetna Health of California Inc.

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 63 Cal.App.5th 660
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S269212
**Date Filed:** July 17, 2023

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Elihu M. Berle

_____

**Counsel:**

Whatley Kallas, Alan M. Mansfield, Edith M. Kallas, Deborah J. Winegard; Altshuler Berzon, Michael Rubin and Stacey M. Leyton for Plaintiff and Appellant.

Rob Bonta, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen and Amy Chmielewski, Deputy Attorneys General, for the Attorney General of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Strumwasser & Woocher, Michael J. Strumwasser, Bryce A. Gee and Salvador Perez for the American Medical Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Jerry Flanagan and Ryan Mellino for Consumer Watchdog as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Office of Jonathan Weissglass and Jonathan Weissglass for the Service Employees International Union California State Council, International Brotherhood of Teamsters Joint Council 7, Writers Guild of America, West, Inc., United Food and Commercial Workers Western States Council and United Farm Workers of America as Amici Curiae on behalf of Plaintiff and Appellant.

Thomas A. Myers, Jonathan M. Eisenberg and Kirra N. Jones for AIDS Healthcare Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

David Chiu, City Attorney (San Francisco), Yvonne R. Meré and Owen J. Clements, Chief Deputy City Attorneys, Ronald H. Lee, Deputy City Attorney, Barbara J. Parker, City Attorney (Oakland), Mara W. Elliott, City Attorney (San Diego) and Nora V. Frimann, City Attorney (San Jose), for local prosecutors as Amici Curiae on behalf of Plaintiff and Appellant.

Cristina Kladis and Christopher Berry for Animal Legal Defense Fund as Amicus Curiae on behalf of Plaintiff and Appellant.

Spertus, Landes & Umhofer, Matthew Umhofer, Elizabeth Mitchell; Williams & Connolly, Enu Mainigi, Craig Singer, Grant Geyerman and Benjamin Hazelwood for Defendant and Respondent.

Munger, Tolles & Olson, Sarah Weiner and Henry Weissmann for Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendant and Respondent.

Daponde Simpson Rowe, Michael J. Daponde and Darcy Muilenburg for California Association of Health Plans and Association of California Life and Health Insurance Companies as Amici Curiae on behalf of Defendant and Respondent.

The Office of Michael Tenenbaum and Michael Tenenbaum for Ken Frank and Sean Chaney as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stacey M. Leyton
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151 ext. 304

Benjamin Hazelwood
Williams & Connolly LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5159